IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-212

No. COA17-1027-2

Filed 5 April 2022

Sampson County, Nos. 15CRS 53153-54, 15CRS 53165, 16CRS 50156

STATE OF NORTH CAROLINA

v.

CORY DION BENNETT, Defendant.

Appeal by defendant from order entered 9 February 2021 by Judge John E. Nobles, Jr. in Superior Court, Sampson County. Heard in the Court of Appeals 27 April 2021.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Kristin J. Uicker, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Sterling Rozear, for defendant.*

STROUD, Chief Judge.

Defendant Cory Dion Bennett appeals from a trial court order overruling his objections, under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986), to the prosecution's peremptory strikes of two African-American jurors, R.S. and V.B.[1] In a previous appeal, *State v. Bennett*, 374 N.C. 579, 843 S.E.2d 222 (2020) [hereinafter

---

[1] We use the juror's initials throughout to protect their identity because they were struck in part due to allegations of and convictions for criminal activity.

"*Bennett II*"], our Supreme Court found Defendant had presented the "necessary prima facie case of discrimination" required at the first step of *Batson*'s three step inquiry. *Id.*, 374 N.C. at 581, 843 S.E.2d at 224. Defendant's current appeal arises from the remand hearing on *Batson*'s second and third steps. *Id.* Because the trial court properly accepted the prosecutor's race neutral reasons for striking the jurors, we reject Defendant's argument the trial court clearly erred on *Batson*'s second step. Further, after evaluating all the relevant circumstances advanced by Defendant, we hold the trial court did not clearly err in determining Defendant had not met his burden of proving purposeful discrimination at *Batson*'s third step. Therefore, we affirm the trial court's order overruling Defendant's *Batson* objections.

## I.   Background

We rely on our Supreme Court's opinion in *Bennett II* to summarize the background of this case and Defendant's initial appeal. Across two grand juries in 2016, Defendant was charged with five counts of "possessing a precursor chemical with the intent to manufacture methamphetamine," one count of manufacturing methamphetamine, one count each of trafficking in methamphetamine by manufacture and by possession, and one count of possession of a firearm by a felon. *Bennett II*, 374 N.C. at 581, 843 S.E.2d at 224–25. The charges came on for a jury trial in March 2017. *Id.*, 374 N.C. at 581, 843 S.E.2d at 225.

*Bennett II* then summarized the history of three jurors, R.S., V.B., and R.C.,

because Defendant made a *Batson* objection after the prosecutor struck in succession

R.S. and V.B., who are African American, but passed on R.C., who is not. *See* 374

N.C. at 586, 843 S.E.2d at 227–28 (summarizing *Batson* objection). The *Bennett II*

Court listed the following about R.S.:

> In response to the prosecutor's inquiry concerning whether any prospective juror had "ever been the victim of a crime," [R.S.] responded that he had been the victim of a breaking or entering that had occurred approximately two years earlier; that, while law enforcement officers had investigated the incident, no one had ever been charged with the commission of the crime; and that [R.S.] believed that the investigating officers had handled the incident in a satisfactory manner. In addition, [R.S.] informed the prosecutor that, while he recognized one of the other prospective jurors, who worked at a local bank, his connection with this other prospective juror would not affect his ability to decide the case fairly and impartially in the event that he was selected to serve as a member of the jury.
>
> [R.S.] responded to prosecutorial inquiries concerning whether anything would make it difficult for him to be a fair and impartial juror and whether there was anything going on in his life that would make it difficult for him to serve on the jury in the negative. Similarly, [R.S.] denied having any religious, moral, or ethical concerns that would prevent him from voting to return a guilty verdict.

374 N.C. at 581–82, 843 S.E.2d at 225 (alterations to preserve juror confidentiality).

The prosecutor exercised a peremptory challenge to strike R.S. after he finished

questioning all the venire members initially seated in the jury box. *Id.*, 374 N.C. at

582, 843 S.E.2d at 225.

¶ 4        V.B., who is also African American, then replaced R.S., and our Supreme Court

described her as follows:

> [V.B.] responded to the trial court's initial questions by
> stating that she was not aware of any reason that she
> would be unable to be fair to either the State or defendant.
> [V.B.] . . . owned a beauty salon . . . [near] the courthouse.[2]
> After stating that she did not know anyone involved in the
> prosecution or defense of the case or any of the other
> prospective jurors, [V.B.] told the prosecutor that she had
> never been the victim of crime, a defendant or witness in a
> case, or a juror. In addition, [V.B.] stated that she did not
> have any strong feelings, either favorable or unfavorable,
> concerning the law enforcement profession; that she had
> not heard anything about the charges against defendant
> before arriving for jury selection; and that she would be
> able to be impartial to both sides. Similarly, [V.B.]
> expressed no reservations concerning the fact that
> possession of a firearm by a felon is unlawful and said that
> she was not confused by the distinction between the
> concepts of actual and constructive possession.
>
> [V.B.] stated that she would be able to listen to and fairly
> consider the testimony of a witness who had entered into a
> plea agreement with the State, that she did not know any
> of the other prospective jurors who were seated in the jury
> box with her, and that she understood that legal dramas on
> television were not realistic. To [V.B.]'s knowledge, neither
> she, a member of her family, nor a close friend had ever had
> a negative experience with a member of the law
> enforcement profession or a member of the District
> Attorney's staff or had ever been charged with committing
> an offense other than speeding.

---

[2] We have removed the precise location of the beauty salon to protect V.B.'s identity.
However, as we discuss later on, the existence of the salon near the courthouse is relevant
because the prosecutor used it to explain his reasons for striking V.B.

In response to further prosecutorial questioning, [V.B.] stated that she understood that defendant was presumed to be innocent; that he possessed the rights to a trial by jury, to call witnesses to testify in his own behalf, and to refuse to testify; and that any refusal on his part to testify in his own behalf could not be held against him. Moreover, [V.B.] stated that she understood the difference between direct and circumstantial evidence, that she understood that the State was required to establish defendant's guilt beyond a reasonable doubt, and that she would be required as a member of the jury to assess the credibility of the witnesses.

[V.B.] assured the prosecutor that she could listen to all of the evidence, keep an open mind, and follow the law in accordance with the trial court's instructions; agreed with the prosecutor's comment that "the law is not always what we think it is or what we would like it to be"; and acknowledged that, in the event that she was selected to serve as a juror in this case, she would be required to follow the law and apply the law set out in the trial court's instructions to the facts. At that point, the following colloquy occurred between the prosecutor and [V.B.]:

> MR. THIGPEN: Do you think you could reach a verdict based only on hearing the evidence from the witness stand, or do you feel like in order to reach a verdict or to make a decision you would have to actually watch the alleged event happen?
> [V.B.]: Yeah.
> MR. THIGPEN: Okay. You looked confused. Some people—I have had jurors before that have said, "I can't make a decision until I see it happen."
> [V.B.]: Uh-huh.
> MR. THIGPEN: Okay. Do you feel like you could base your decision on just what the witnesses say, or do you feel like you have to watch it happen?
> [V.B.]: Kind of on both.
> MR. THIGPEN: What do you mean?

> [V.B.]: Sometimes, I guess, it's better to not have hearsay.
> MR. THIGPEN: Well, if you watched it happen, you would be a witness; right?
> [V.B.]: Right.
> MR. THIGPEN: And if you were a witness, you can't be a juror. Does that make sense?
> [V.B.]: Yes.
> MR. THIGPEN: So the only thing we have is witness testimony.
> [V.B.]: Okay.
> MR. THIGPEN: So do you feel like you could make a decision based only on hearing the testimony of the witnesses or before you could make that decision would you actually want to watch it happen?
> [V.B.]: Yeah.
> MR. THIGPEN: Okay. What you said was, "Yeah."
> [V.B.]: Yeah, I could make that decision through—
> MR. THIGPEN: Based on the testimony?
> [V.B.]: Uh-huh.
>
> After reiterating that nothing would make it difficult for her to be fair and impartial to either side and that nothing was going on in her life outside of the courtroom that would render jury service unduly burdensome, [V.B.] stated that she did not have any religious, moral, or ethical concerns about voting for a guilty verdict in the event that the State satisfied its burden of proof.

*Id.*, 374 N.C. at 582–84, 843 S.E.2d at 225–26 (alterations to preserve juror confidentiality). The prosecutor then also peremptorily challenged V.B. *Id.*, 374 N.C. at 584, 843 S.E.2d at 226.

Juror R.C., who is not African American, then replaced V.B., and the Supreme Court described her as follows:

In responding to the trial court's initial questions, [R.C.]
stated that there was no reason that she could not be fair
to either the State or defendant. . . . . In response to
prosecutorial questions, [R.C.] said that she did not know
the prosecutor, defendant, or defendant's attorney. [R.C.]
denied having ever been the victim of a crime, a defendant,
or a witness in a case. However, [R.C.] had served as a
member of a criminal jury in Sampson County about thirty
years earlier. According to [R.C.], the jury upon which she
served had deliberated on the case, she had not served as
the foreperson of the jury, and nothing about that
experience would impact her ability to serve on the present
jury.

[R.C.] denied having strong feelings, either favorable or
unfavorable, about the law enforcement profession and
indicated that she had not read, heard, or seen anything
about the charges against defendant before arriving in
court for jury service. In addition, [R.C.] denied having any
reservations about the fact that felons are prohibited from
possessing firearms and expressed no confusion about the
difference between actual and constructive possession.
During a colloquy with the prosecutor, [R.C.] gave the
following answers:

> MR. THIGPEN: Okay. Now, [R.C.], a witness may
> testify on behalf of the State as a result of a plea
> agreement with the State in exchange for [a]
> sentence concession. Based on that fact and that fact
> alone, would you not be able to consider that person's
> testimony along with all other evidence that you
> would hear in the case?
> [R.C.]: Yes, sir. No, sir.
> MR. THIGPEN: Do you understand my question?
> [R.C.]: Say it again.
> MR. THIGPEN: A witness may testify under a plea
> agreement in exchange for a sentence concession.
> [R.C.]: Okay.
> MR. THIGPEN: Now if that person were to testify,

> are you just going to go, [t]his person's made a deal;
> I don't care what they are going to say, or would you
> listen to it and consider it just like anybody else?
> [R.C.]: I would listen to their testimony and consider
> it.

[R.C.] did not know any of the other prospective jurors and understood that legal dramas were not based upon reality.

[R.C.] told the prosecutor that neither she, a member of her family, nor a close friend had ever had an unpleasant experience with a law enforcement officer or a member of the District Attorney's staff. [R.C.] acknowledged that certain drug charges involving her brother had been resolved, stated that she felt that the law enforcement officers involved in that situation had treated her brother fairly, and said that nothing about that experience would affect her ability to be a fair and impartial juror. [R.C.] understood that defendant was presumed to be innocent until proven guilty beyond a reasonable doubt; that he possessed the right to trial by jury, to call witnesses in his own behalf, and to refuse to testify; and that any decision that he might make to refrain from testifying in his own behalf could not be held against him.

[R.C.] told the prosecutor that she understood the difference between direct and circumstantial evidence and that, as a member of the jury, she would be required to assess the credibility of the witnesses. [R.C.] expressed confidence in her ability to listen to all of the evidence, keep an open mind, and follow the law in accordance with the trial court's instructions. [R.C.] agreed with the prosecutor that "the law is not always what we think the law is or what you think it should be" and that, as a juror, she would be required to use common sense, follow the law, and apply the law to the facts. In addition, [R.C.] stated that she "would not have to see the event happen"; that she could reach a verdict based upon the testimony of witnesses; and that she did not know of anything that would make it

> difficult for her to be fair and impartial to both the State
> and defendant.
>
> When the prosecutor inquired whether there was anything
> occurring in her life outside of the courtroom that would
> make jury service difficult, [R.C.] mentioned her work-
> related obligations and stated that she was supposed to
> take her daughter-in-law to a doctor's appointment. On the
> other hand, [R.C.] agreed that the other prospective jurors
> probably had similar employment-related concerns and
> acknowledged that her daughter-in-law could use some
> other means to get to her appointment. Finally, [R.C.]
> stated that she did not have any religious, moral, or ethical
> concerns that would prevent her from voting to return a
> guilty verdict.

*Id.*, 374 N.C. at 584–86, 843 S.E.2d at 226–27 (alterations to preserve juror

confidentiality).  The prosecutor then accepted R.C. as a juror.  *Id.*, 374 N.C. at 586,

843 S.E.2d at 227.

¶ 6          After the prosecutor accepted R.C., Defendant made a *Batson* motion on the

grounds that R.S. and V.B. were both Black and had both been excused.  *Id.*, 374 N.C.

at 586, 843 S.E.2d at 227–28.   Defendant's attorney argued: "there was no

overwhelming evidence, there was nothing about any prior criminal convictions, any

feelings about—towards or against law enforcement, there's no basis, other than the

fact that those two jurors happen to be of African[ ]American de[s]cent [and] they

were excused."  *Id.*, 374 N.C. at 586–87, 843 S.E.2d at 228 (alterations in original).

The prosecutor argued Defendant had not passed *Batson*'s first step because he had

not made a prima facie showing of discrimination simply by indicating both struck

jurors were Black. *Id.*, 374 N.C. at 587, 843 S.E.2d at 228. After noting the prosecutor had already accepted three African-American jurors before striking R.S. and V.B., the trial court denied Defendant's *Batson* motion because Defendant had not made a prima facie showing. *Id.*

¶ 7 After the jury convicted Defendant of all charges, except the possession of a firearm by a felon, and the trial court sentenced him, Defendant appealed to this Court arguing he had made a prima facie showing under *Batson*.[3] *Id.*, 374 N.C. at 587–88, 843 S.E.2d at 228–29. This Court held Defendant failed to make a prima facie case. *Id.*, 374 N.C. at 588, 843 S.E.2d at 229. The Supreme Court granted discretionary review. *Id.*, 374 N.C. at 590, 843 S.E.2d at 230.

¶ 8 On review, the Supreme Court reversed this Court and concluded Defendant presented a prima facie case of discrimination. *Id.*, 374 N.C. at 581, 843 S.E.2d at 224. First, the court noted the numerical disparity in acceptance rates of African American versus white prospective jurors. *Id.*, 374 N.C. at 599, 843 S.E.2d at 235. It then highlighted "the absence of any significant dissimilarity between the answers

---

[3] During Defendant's initial appeal, the State questioned whether the record contained sufficient information about the jurors' races to have preserved the *Batson* issue for review. *See id.*, 374 N.C. at 588–90. 843 S.E.2d at 229–30 (explaining the State raised the issue and recounting how this Court addressed the issue). The Supreme Court upheld this Court's ruling "that the record contains sufficient information to permit us to review the merits of [D]efendant's *Batson* claim." *Id.*, 374 N.C. at 594, 843 S.E.2d at 233. As part of the order on appeal here, the State and Defendant ultimately agreed to the race of each prospective juror, so we do not need to revisit the issue.

given by" R.S., V.B., and R.C. or "any apparent indication arising from the face of the record that either" R.S. or V.B. "would not have been satisfactory jurors from a prosecutorial point of view . . . ." *Id.*, 374 N.C. at 599, 843 S.E.2d at 235–36. Finally, the Supreme Court rejected the State's argument that the prosecutor's acceptance of three African-American jurors before and of a further two after striking R.S. and V.B. negated the prima facie case of discrimination. *Id.*, 374 N.C. at 600–01, 843 S.E.2d at 236–37.

¶ 9     Based on that ruling, the Supreme Court remanded the case to this Court for further remand to the trial court "for a hearing to be held for the purpose of completing the second and third steps" of the *Batson* analysis. *Id.*, 374 N.C. at 602–03, 843 S.E.2d at 238. As the Supreme Court had previously summarized, step two obligated the prosecutor to present a "race-neutral explanation for the challenge," and step three required the trial court to determine "whether the defendant has met the burden of proving purposeful discrimination." *Id.*, 374 N.C. at 592, 843 S.E.2d at 231 (quoting *State v. Waring*, 364 N.C. 443, 474–75, 701 S.E.2d 615, 636 (2010)).

¶ 10    The trial court held the required remand hearing on 4 November 2020. At the remand hearing, the prosecutor addressed step two by offering race neutral reasons for striking R.S. and V.B. He explained he struck R.S. for failing to disclose a criminal record:

> So as it relates to, first, Perspective [sic] Juror

Number 10, [R.S.], Judge, based upon the information that I had, [R.S.] had an undisclosed criminal record that included a conviction for common law robbery and possession with intent to sell an unauthorized recording device from Pitt County and a probation violation. I made a note of his record. When he was called into the box, and if it -- and it was important to me because of the prior felony conviction. He's the only juror of which I made that note and he's the only juror that I noted had a prior felony conviction.

I asked the panel twice, including [R.S.], while he was in the panel about a criminal history. I asked, first, if anyone had ever been a defendant in a case before, and I explained what that meant. Secondly, I asked if a juror, a member of their family, or a close friend had been charged or convicted of anything other than speeding. [R.S.] did not answer.

¶ 11     The prosecutor then offered two reasons to justify his strike of V.B., an answer

to a question exhibiting confusion and concerns her business was linked to a drug

investigation:

As it relates to [V.B.], Judge, she appeared to have some difficulty with what I call the "watch-it-happen question." And that's a question that came out of an older sexual assault case that two of my colleagues tried several years ago. The jury hung 11 to 1, actually it was tried in another county. The holdout juror in that case said he could not make a decision unless he saw it happen. So after that trial, we started working into our jury selection, a question about whether or not a juror could make a decision based only upon hearing testimony.

I noted that [V.B.] looked confused by the question. She said she could base her decision on "kind of both" or "kind of on both." I tried to clarify that by asking her what she meant and she replied, "Sometimes I guess it's better not to have hearsay."

Well, Judge, that told me that she preferred maybe video evidence or something other than just live testimony. I knew that there would not be any video testimony. Officers in this case don't have or did not wear body cameras and did not have in-car. I tried to clarify that question again and her answer was, "Yeah." I asked the question again and her she [sic] responded, "Uh-huh." So, at that point, I'm beginning to get concerned that she's telling me what she thinks I want to hear, and I'm questioning does she understand what I'm asking. She is the only juror that gave those responses and had that apparent difficulty with that question.

Also, as it relates to [V.B.], Deputy Gore was seated with me at counsel table. She's here today, seated further away due to concerns with the virus, but she was seated with me at counsel table, and that's been my practice during jury selection, for my career, to have the charging officer sit with me. Deputy Gore has been a drug officer since 2008. At the end of my questions, I asked for a moment and conferred with Deputy Gore. Deputy Gore expressed concerns to me about [V.B.]'s business regarding a prior drug investigation . . . .

I asked [V.B.], specifically, about her business to determine which beauty salon she referred to. . . . . So I asked her to clarify that. I then asked for a moment to confer with Deputy Gore again. Deputy Gore indicated that she believed that [V.B.]'s salon had been part of the . . . investigation, which I was aware of and knew was a multiagency drug investigation.

I was familiar with [the target of the drug investigation] and I recalled seeing him outside the beauty salon and the barbershop. The beauty salon she identified is actually, I believe that's . . . [near] the courthouse. . . . .

. . . . I was concerned that [V.B.], in addition to the issues with the -- what I call the watch-it-happen question, that she could be fair if her business was part of a drug investigation. So those would be my reasons for my two challenges.

¶ 12        After receiving that information, Defendant's counsel took a few minutes to confer. The trial court then offered them a recess if they wanted it, but they responded "I don't think that's necessary. I appreciate it. I think we're good."

¶ 13        As an initial matter related to the strike of R.S., Defendant argued the record did not include evidence of his prior conviction, but the trial court told him to either present evidence to the contrary or move on:

> [MR. ROZEAR (one of Defendant's attorneys)]: . . . . And I first note that we don't have anything in the record in front of us showing the existence of this conviction, so I'm not sure that –
> THE COURT: Are you saying that Mr. Thigpen is not correct when he said he had that criminal record?
> MR. ROZEAR: I -- I -- I don't know. I have no --
> THE COURT: The Court's accepting that as the gospel. I don't think he would have said that if that wasn't the case. I can't imagine -- now if it isn't the case, obviously, we've got a problem.
> MR. ROZEAR: Right.
> THE COURT: But I don't think I would make that accusation unless you've got some basis for it.
> MR. ROZEAR: Fair enough, Your Honor.

¶ 14        At the remainder of the remand hearing, Defendant presented numerous reasons the trial court should find the prosecutor's explanations were pretextual at *Batson*'s third step. He first argued the strike rate evidenced discrimination. Specifically, defense counsel noted the prosecutor had a strike rate of 40% for Black jurors and 0% for non-Black jurors in the case. As part of that argument, Defendant contended the trial court should not find a lack of discrimination simply because the

prosecutor accepted some Black jurors. While the prosecutor accepted three Black jurors before R.S. and V.B. and accepted two more after, Defendant proposed that because the prosecutor struck R.S. and V.B. from the same seat in succession, this demonstrated "they didn't want a [B]lack juror in" that seat. In response, the prosecutor asked the trial court to assess his credibility to determine he was not passing on other Black jurors to cover his strikes of R.S. and V.B.

¶ 15      Defendant then argued the prosecutor's explanation for striking R.S., based on his undisclosed criminal record, was pretext because the prosecutor never asked R.S. about it. The prosecutor responded by explaining his usual process for jury selection; he had an assistant run criminal history checks on all the potential jurors and then made "a cheat sheet" with all the information to quickly assess it during jury selection. Further, the prosecutor did not want to embarrass R.S. by bringing up his criminal conviction during the voir dire.

¶ 16      Defendant made a similar argument that the prosecutor did not question V.B. about her business's connection to the drug investigation. The prosecutor responded he did not want to embarrass V.B. or reveal law enforcement's methods of undercover investigation.

¶ 17      Further, Defendant challenged the prosecutor's explanation he struck V.B. for her difficulty with the "watch-it-happen question." First, Defendant asserted in *Bennett II* our Supreme Court said "there was nothing in the record that showed a

difference between the jurors." Defendant also contended a comparison with R.C. based on difficulty with a question would show R.C., who is not Black, and V.B., who is Black, were similarly situated. The prosecutor responded to the comparison that the difference between the questions R.C. and V.B. demonstrated confusion about was critical. R.C.'s answer was "not as big an issue" to him because he "expect[ed] people to be skeptical of confidential informants, of cooperating codefendants" and was not planning on calling the witness who would be testifying pursuant to the plea agreement. By contrast, the question he asked to V.B. was critical because he was concerned "she regarded testimony as hearsay" and his whole case was "going to be witness testimony."

¶ 18    After that comparison, Defendant argued the trial court should consider the susceptibility of the case to racial bias on the basis Defendant is Black and was charged with a drug offense. To support that argument, Defendant presented statistics showing Black people were disproportionately arrested and sentenced for drug crimes. Defendant also presented as exhibits various reports supporting their data. The prosecutor responded the case was not susceptible to racial discrimination because this was a drug case without victims so there could not be a cross-racial crime.

¶ 19    Finally, Defendant argued historical evidence showed Sampson County prosecutors disproportionately struck qualified Black jurors. To support that

argument, Defendant entered as exhibits two studies with data on juror strike rates by race that showed qualified Black jurors were struck disproportionately to qualified non-Black jurors. The prosecutor responded the main study was not reliable because it: (1) did not include the experiences of prosecutors; (2) relied on law students and recent graduates to collect data; and (3) was gathered off a cold trial transcript. The prosecutor further argued it was wrong to impute to him another prosecutor's alleged use of a peremptory strike based on race.

¶ 20        At the end of the hearing, the trial court requested both sides present proposed orders. Both sides also agreed an order could be entered out of county and out of session.

¶ 21        On 9 February 2021, the trial court entered an order overruling Defendant's *Batson* objections as to both R.S. and V.B. After recounting the history of the case, the order first listed the agreed-upon races of each prospective juror. The trial court then recounted how our Supreme Court had already determined Defendant met his burden on *Batson*'s first step and how the case was remanded for a hearing on the remaining two steps. As to *Batson*'s second step, the trial court found the prosecutor "met his burden of production and provided race-neutral reasons for his use of peremptory challenges to both" R.S. and V.B.

¶ 22        On *Batson*'s third step, the order explained the trial court weighed the totality of the circumstances surrounding the strikes and found the prosecutor's "proffered

reasons were the actual reasons for the peremptory challenges" and his challenges of R.S. and V.B. were not made "on the basis of race." To support that conclusion the trial court first found the case was not susceptible to racial discrimination because there were no cross-racial identifications by witnesses nor cross-racial victims; as a corollary the trial court found Defendant is African American, there are no victims, and there was no record of the race of key witnesses. On the same factor, in relation to Defendant's evidence of racial disparities in drug arrests and sentencing, the trial court found: "These facts, if true, would not give a prosecutor motivation to keep members of a particular race off the jury."

¶ 23 The trial court further determined the prosecutor did not engage in disparate questioning or investigation. It also did not credit side-by-side comparisons. The order then recounted how the prosecutor accepted three African-American jurors before the *Batson* challenge and a further two after it, thereby "negat[ing] an inference of racial discrimination or motivation." The trial court further discounted the statistical evidence of racially disproportionate strikes in Sampson County because: (1) the prosecutor in this case was not involved with the cases examined in the studies; (2) the studies did not take into account prosecutors' viewpoints; (3) the study used recent law graduates to collect data; and (4) the studies were conducted using "cold trial transcripts." With regard to the strike of R.S., the order finally specifically recounted how the prosecutor checked all potential jurors' criminal

records and did not ask R.S. about the conviction to avoid embarrassing him. Based on those findings, the order overruled both of Defendant's *Batson* objections.

¶ 24 Defendant appealed directly to the Supreme Court of North Carolina, and it remanded to this Court "with instructions to examine the order that was entered by the trial court on remand on 9 February 2021 and to conduct any further review of that order that it deems appropriate . . . ."

## II. Analysis

¶ 25 "The use of peremptory challenges for racially discriminatory reasons violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."[4] *State v. Locklear*, 349 N.C. 118, 136, 505 S.E.2d 277, 287 (1998) (citing *Batson*, 476 U.S. 79, 106 S. Ct. 1712). When a court must determine whether a prosecutor violated *Batson* by exercising a peremptory challenge based on race, it employs a three-step inquiry:

> First, the party raising the claim must make a prima facie showing of intentional discrimination under the totality of the relevant facts in the case. Second, if a prima facie case is established, the burden shifts to the State to present a race-neutral explanation for the challenge. Finally, the

---

[4] While Article I, Section 26 of the North Carolina Constitution also bars racially discriminatory peremptory strikes, *Locklear*, 349 N.C. at 136, 505 S.E.2d at 287, Defendant argues based on the United States Constitution alone. Even if Defendant were arguing under the North Carolina Constitution, our analysis under Article I, Section 26 would be identical. *See Waring*, 364 N.C. at 474, 701 S.E.2d at 635 ("Our review of race-based or gender-based discrimination during petit jury selection has been the same under both the Fourteenth Amendment to the United States Constitution and Article 1, Section 26 of the North Carolina Constitution.").

trial court must then determine whether the defendant has
met the burden of proving purposeful discrimination.

*Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231 (quoting *Waring*, 364 N.C. at 474–75,

701 S.E.2d at 636).

¶ 26 Here, our Supreme Court, in *Bennett II*, already determined Defendant

established "the necessary prima facie case of discrimination" under *Batson* step one.

374 N.C. App. at 581, 843 S.E.2d at 224. Defendant presents challenges to the trial

court's analysis under *Batson* steps two and three. We explain the standard of review

before turning to Defendant's arguments under steps two and three.

**A. Standard of Review**

¶ 27 When reviewing a trial court's *Batson* analysis, "a trial court's ruling on the

issue of discriminatory intent must be sustained unless it is clearly erroneous."

*Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207 (2008); *State v. Clegg*,

2022-NCSC-11, ¶50 (quoting same language from *Snyder*). "Such 'clear error' is

deemed to exist when, on the entire evidence[,] the Court is left with the definite and

firm conviction that a mistake has been committed." *Clegg*, ¶ 37 (quoting *Bennett II*,

374 N.C. at 592, 843 S.E.2d at 231) (alteration in original). This deferential standard

reflects that "[a] trial court's rulings regarding race-neutrality and purposeful

discrimination are largely based on evaluations of credibility . . . ." *State v. King*, 353

N.C. 457, 469–70, 546 S.E.2d 575, 586–87 (2001). As our courts have recognized

before, trial courts are "in the best position to assess the prosecutor's credibility . . . ." *State v. Cummings*, 346 N.C. 291, 309, 488 S.E.2d 550, 561 (1997); *see also Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869 (1991) (explaining "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province" (quotations and citation omitted)).

¶ 28        Under the clearly erroneous standard, "[t]he trial court's findings will be upheld on appeal unless the 'reviewing court on the entire evidence [would be] left with the definite and firm conviction that a mistake ha[d] been committed.'" *State v. Chapman*, 359 N.C. 328, 339, 611 S.E.2d 794, 806 (2005) (quoting *Hernandez*, 500 U.S. at 369, 111 S. Ct. at 1871) (alterations in original). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *King*, 353 N.C. at 470, 546 S.E.2d at 587 (quotations and citations omitted); *see also Hernandez*, 500 U.S. at 369, 111 S. Ct. at 1871 (including identical language). This deference, however, "does not by definition preclude relief." *Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231 (quoting *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005)). Applying the clearly erroneous standard of review, we now turn to Defendant's contentions.

**B. *Batson* Step Two**

¶ 29        Defendant first argues, under *Batson*'s second step, the trial court clearly erred in concluding "that the prosecutor had offered race-neutral explanations for the

strikes of two jurors . . . ." Specifically, Defendant contends "the record must support a purported justification for a strike . . . ." Defendant then claims two of the prosecutor'a justifications for striking jurors R.S. and V.B.—namely R.S.'s undisclosed criminal record and a connection between V.B.'s business and a drug investigation—were not supported by the record. Before reaching the merits of Defendant's argument, we respond to the State's contention Defendant failed to preserve his step two arguments.

### *1. Preservation*

¶ 30       The State first asserts Defendant did not preserve this argument because he "did not challenge the race-neutral character of the prosecutor's reasons or argue that the reasons did not otherwise satisfy step two of *Batson*." (Underline changed to italics.) Instead, the State contends Defendant's arguments went to step three and whether the reasoning was pretextual.

¶ 31       Under Rule of Appellate Procedure 10(a)(1), a party must present and "obtain a ruling" on an objection, motion, or other request to a trial court to preserve it for appellate review. N.C. R. App. P. 10(a)(1). Our courts have also "long held that where a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts in order to get a better mount in" an appellate court. *State v. Sharpe*, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) (quotations

and citations omitted).  To properly preserve an issue for appellate review, therefore, a defendant must (1) raise the issue below and (2) argue the same theory below.

¶ 32      Our review of the remand hearing transcript reveals it was not neatly divided into steps two and three, and we would not necessarily expect it to be once the prosecutor proffered some reason for his strikes.  Still, Defendant's attorneys brought up the lack of evidence in the record for R.S.'s conviction before being cut off by the trial court and told the trial court was accepting the prosecutor's representation given Defendant lacked evidence to the contrary:

> [MR. ROZEAR (one of Defendant's attorney's)]: . . . . *And I first note that we don't have anything in the record in front of us showing the existence of this conviction*, so I'm not sure that –
> THE COURT: Are you saying that Mr. Thigpen is not correct when he said he had that criminal record?
> MR. ROZEAR: I -- I -- I don't know. I have no --
> THE COURT: The Court's accepting that as the gospel. I don't think he would have said that if that wasn't the case. I can't imagine -- now if it isn't the case, obviously, we've got a problem.
> MR. ROZEAR: Right.
> THE COURT: But I don't think I would make that accusation unless you've got some basis for it.
> MR. ROZEAR: Fair enough, Your Honor.

(Emphasis added.)    While the trial court's intervention prevented Defendant's attorney from finishing his argument, Defendant's counsel started arguing the lack of evidence in the record was a problem.  Given Defendant's attempt to argue under

the lack-of-evidence theory and the trial court's subsequent intervention, we are not comfortable concluding Defendant failed to preserve his *Batson* step two argument.[5]

¶ 33        The State also argues Defendant's argument on appeal "actually contradicts his argument in the trial court."  Specifically, the State contends Defendant "implicitly recognized the [prosecutor's] explanation's race-neutral character" by recognizing that R.S.'s failure to disclose his criminal record could have amounted to a challenge for cause.  The State cites *Hernandez* in support of its argument that a reason offered by the prosecutor is race neutral if it "corresponds to a valid for-cause challenge."  500 U.S. at 362–63, 111 S. Ct. 1868.

¶ 34        Again we reject the State's argument.  In the portion of the transcript to which the State cites, Defendant's attorney is arguing under *Batson* step three as seen by his focus on whether the undisclosed conviction was the real issue or was merely pretextual: "*So if this were really the issue*, Mr. Thigpen probably could have had [R.S.] excused for cause by investigating this area further, and not had to use a peremptory in this case."  (Emphasis added.)  Notably, this statement also occurred after the trial court had made its above statements about accepting the prosecutor's proffered explanation "as the gospel."  As we explained above, the trial court's comments came after it interrupted arguments from Defendant's counsel under step

---

[5] Our lack of definite determination of the preservation issue ultimately does not alter our conclusion on the step two issue because we reject Defendant's arguments on the merits.

two, so the Defendant's attorneys were merely continuing with the *Batson* inquiry after the trial court's adverse ruling. Given that sequence of events, we do not accept the State's argument that Defendant implicitly waived his step two argument. Since we do not credit either of the State's preservation arguments, we proceed to evaluate Defendant's *Batson* step two arguments on the merits.

### 2. Merits

Under *Batson*'s second step, once a defendant has made a prima facie showing of intentional discrimination, "the analysis proceeds to . . . where the State is required to provide race-neutral reasons for its use of a peremptory challenge." *State v. Hobbs*, 374 N.C. 345, 352, 841 S.E.2d 492, 499 (2020) (citing *Flowers v. Mississippi*, __ U.S. __, 139 S. Ct. 2228, 2243 (2019)). As our Supreme Court recently summarized:

> The State's explanation must be clear and reasonably specific, but does not have to rise to the level of justifying a challenge for cause. *See* [*State v.*] *Bonnett*, 348 N.C. [417,] 433, 502 S.E.2d [563,] 574 [1998]; *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990). Moreover, " 'unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Bonnett*, 348 N.C. at 433, 502 S.E.2d at 574–75 (quoting *Hernandez*, 500 U.S. at 360, 111 S. Ct. at 1866, 114 L. Ed. 2d at 406); *see also Purkett v. Elem*, 514 U.S. 765, 768-69, 115 S. Ct. 1769, 1771–72, 131 L. Ed. 2d 834, 839-40 (1995); *State v. Barnes*, 345 N.C. 184, 209-10, 481 S.E.2d 44, 57*, cert. denied*, 522 U.S. 876, 118 S. Ct. 196, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 118 S. Ct. 1309, 140 L. Ed. 2d 473 (1998). In addition, the second prong

> provides the defendant an opportunity for
> surrebuttal to show the State's explanations for the
> challenge are merely pretextual. *See State v. Gaines*,
> 345 N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied*,
> 522 U.S. 900, 118 S. Ct. 248, 139 L. Ed. 2d 177
> (1997); *State v. Robinson*, 330 N.C. 1, 16, 409 S.E.2d
> 288, 296 (1991).
>
> [*State v.*] *Golphin*, 352 N.C. [364,] 426, 533 S.E.2d [168,]
> 211 [2000]. Therefore, at *Batson*'s second step, the State
> offers explanations for the strike which must, on their face,
> be race-neutral. If they are, then the court proceeds to the
> third step.

*Id.*, 374 N.C. at 352–53, 841 S.E.2d at 499.

¶ 36    Expanding upon that summary, the requirement that the State's explanation must be clear and reasonably specific means the prosecutor must do more than "merely deny[] that he had a discriminatory motive" or "merely affirm[] his good faith." *Purkett*, 514 U.S. at 769, 115 S. Ct. at 1771. "Furthermore, if not racially motivated, the prosecutor may exercise peremptory challenges on the basis of legitimate hunches and past experience." *State v. Lyons*, 343 N.C. 1, 13, 468 S.E.2d 204, 209 (1996). Notably, the reason does not have to be "a reason that makes sense, but a reason that does not deny equal protection." *Purkett*, 514 U.S. at 769, 115 S. Ct. at 1771; *see also id.*, 514 U.S. at 767–68, 115 S. Ct. at 1771 ("The second step of this process does not demand an explanation that is persuasive, or even plausible."); *Clegg*, ¶ 47 (citing the same *Purkett* quote about an explanation not needing to be persuasive or even plausible); *Lyons*, 343 N.C. at 13, 468 S.E.2d at 209 ("The

prosecutor is not required to provide an explanation that is persuasive, or even plausible."). This concept is what *Hobbs* means by its statement that the reason will be race-neutral unless discriminatory intent is inherent. 374 N.C. at 352, 841 S.E.2d at 499.

¶ 37 Further, while *Hobbs*'s summary includes a defendant's opportunity for a surrebuttal within step two, that simply sets up step three where the trial court must decide whether the defendant met his burden of showing intentional discrimination. *See Clegg*, ¶ 63 n.4 (explaining after the prosecutor offers race-neutral reasoning at step two, the defendant can submit evidence to show the prosecutor's reasoning is pretext and the prosecutor can offer surrebuttal before the trial court makes its "ultimate ruling under step three"). At step three the trial court "consider[s] the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties," *Hobbs*, 374 N.C. at 353, 841 S.E.2d at 499 (quoting *Flowers*, 139 S. Ct. at 2243), so for consistency defendants must have given that information prior to step three. Notably, the opportunity for surrebuttal does not change the otherwise low bar prosecutors have at the second step to give a race neutral explanation.

¶ 38 The United States Supreme Court recognized that low bar when it said the *Batson* inquiry proceeds to step three "even if the State produces only a frivolous or utterly nonsensical justification for its strike." *Johnson v. California*, 545 U.S. 162,

171, 125 S. Ct. 2410, 2417 (2005). The history of *Batson* in our state also demonstrates this low bar. Our courts have only once upheld a *Batson* objection to a prosecutor's striking of a juror of color at step two of the inquiry. *See State v. Robinson*, 375 N.C. 173, 178 & n.4 846 S.E.2d 711, 716 & n.4 (2020) [hereinafter "*Robinson III*"] (stating the Supreme Court of North Carolina has never held a prosecutor intentionally discriminated against a juror of color before mentioning a case where this Court found a *Batson* violation because of the prosecutor's lack of explanation); *see also Clegg*, ¶ 112 (Earls, J., Concurring) (updating history of *Batson* challenges in the state to note *Clegg* was the first case where our courts have ever found a substantive *Batson* violation at step three).[6] In that case, the prosecutor offered no explanation at all for striking some of the jurors. *State v. Wright*, 189 N.C. App. 346, 352–54, 658 S.E.2d 60, 64–65 (2008). As our Supreme Court recently emphasized, the inquiry at step two "is limited only to whether the prosecutor offered reasons that are race-neutral, not whether those reasons withstand any further scrutiny; *that scrutiny is reserved for step three*." *Clegg*, ¶ 62 (emphasis added).

---

[6] We acknowledge Defendant cited this history of *Batson* in our state to argue in favor of its step two argument. As explained below, our precedents do not allow us to strengthen step two regardless of Defendant's admonition in his reply brief that this Court and our Supreme Court can do the work of strengthening *Batson*. As an intermediate appellate court, we are ultimately bound by higher precedents. *E.g. State v. Jones*, 253 N.C. App. 789, 796, 802 S.E.2d 518, 523 (2017). In addition, our Supreme Court has very recently reiterated the three-step analysis, including the low bar of step two, in *State v. Clegg*. *Id.*, ¶ 62.

¶ 39        Defendant's *Batson* step two argument fails because it misunderstands the low level of the bar a prosecutor must clear at that step.  The second step does not require evidence in the record to support the prosecutor's articulated reason; a prosecutor must merely articulate a reason, *see Wright*, 189 N.C. App. at 352–54, 658 S.E.2d at 64–65 (finding error when prosecutor failed to articulate any reason for striking some jurors), and one that does not inherently reveal discriminatory intent.  *Hobbs*, 374 N.C. at 352, 841 S.E.2d at 499.  Given the explanation can be "frivolous or utterly nonsensical," *Johnson*, 545 U.S. at 171, 125 S. Ct. at 2417, a potentially legitimate explanation for which the prosecutor lacked evidence could also pass step two.  *See Lyons*, 343 N.C. at 13, 468 S.E.2d at 209 (explaining prosecutors pass step two if their reason was based on "legitimate hunches and past experience").

¶ 40        Our Supreme Court's precedent further supports our determination a prosecutor does not need record evidence to pass *Batson*'s second step.  In *State v. King*, our Supreme Court rejected the defendant's argument "there is no evidence in the record to support the prosecutor's belief . . . ."  353 N.C. at 471, 546 S.E.2d at 587–88.  In that case, the prosecutor said he struck a Black juror because he had information of an investigation into the juror's father that forced the father to resign from the police department.  *Id.*, 353 N.C. at 470–71, 546 S.E.2d at 587.  The Supreme Court emphasized the issue at step two is the "facial validity" of the prosecutor's stated reason.  *Id.*, 353 N.C. at 471, 546 S.E.2d at 587–88 (citing *Hernandez*, 500 U.S.

at 360, 111 S. Ct. 1859). In *King*, the Supreme Court ultimately did not find a *Batson* violation, so the prosecutor's reason must have passed step two. *Id.*, 353 N.C. at 472, 546 S.E.2d at 588.

¶ 41        Here, we follow *King* and reject Defendant's argument that the trial court erred at *Batson*'s second step because there was no evidence in the record to support the prosecutor's strikes of R.S. for his undisclosed criminal record and of V.B. for her business's connection to a drug investigation. Neither of those challenged explanations[7] is inherently discriminatory because they do not rely on the jurors' race or race-based discriminatory stereotypes. *See Hobbs*, 374 N.C. at 352–53, 841 S.E.2d at 499 (explaining a reason will be deemed race-neutral if not inherently discriminatory). Beyond this inquiry, any "scrutiny is reserved for step three." *Clegg*, ¶ 62. Therefore, the trial court did not clearly err at step two in concluding the prosecutor articulated race-neutral reasons for his strikes of R.S. and V.B.

¶ 42        While Defendant cites an Arizona Court of Appeals case, *State v. Ross*, 483 P.3d 251 (2021), in support of his position, we reject that potentially persuasive precedent in the face of *King*'s binding precedent. We also note the Arizona case involved a prosecutor's strike based on the potential juror's conduct in the courtroom, *Ross*, 483 P.3d at 258–59, ¶¶ 28, 31, which was not the reasoning for the strikes here.

---

[7] The prosecutor also argued V.B. was confused by one of his questions. Defendant did not challenge that justification at step two.

As the United States Supreme Court has recognized, the trial court has a greater need to collect evidence when a prosecutor proffers he struck a juror based on the juror's demeanor. *See Snyder*, 552 U.S. at 477, 479, 128 S. Ct. at 1208–09 (stating, "In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance," before noting the trial judge made no findings of fact as to the juror's demeanor); *see also Clegg*, ¶ 47 (citing *Snyder*'s discussion of demeanor and emphasizing the need for the trial court to accept evidence of demeanor).[8]  Notably, *Snyder*'s discussion of supporting a prosecutor's strike came from its explanation of *Batson*'s third step.  552 U.S. at 477, 128 S. Ct. at 1208.

¶ 43   As *Snyder* illustrates, Defendant fails because he argues courts assess evidence supporting the prosecutor's reasoning at step two rather than step three. Instead, under controlling precedent, a court errs "by combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive." *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771.  To say a trial judge "*must terminate* the inquiry at step two when

---

[8] *Clegg*'s citation to *Snyder*'s discussion of demeanor-based reasoning comes in the same paragraph it discussed *Batson*'s second step, *Clegg*, ¶ 47, but *Clegg* ultimately found even the demeanor-based reasoning passed step two, further emphasizing the step's low bar. *Clegg*, ¶ 62.

the race-neutral reason" is not minimally persuasive "violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* (emphasis in original). Here, Defendant's argument threatens to do just that, so we conclude the trial court did not clearly err at step two. But we will consider the alleged lack of record evidence to support the prosecutor's strikes under step three, to which we turn next.

## C. *Batson* Step Three

¶ 44     At *Batson*'s final step the "trial court must . . . determine whether the defendant has met the burden of proving purposeful discrimination." *Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231; *see also*, *Clegg*, ¶ 63 ("[I]n step three, the court carefully weighs all of the reasoning from both sides to ultimately decide whether it was more likely than not that the challenge was improperly motivated." (cleaned up)). To do that, trial courts employ an open-ended list of factors. *See Flowers*, 139 S. Ct. at 2243 (listing factors with the final one being "other relevant circumstances that bear upon the issue of racial discrimination"); *see also Clegg*, ¶ 48 (noting a court can consult "all of the circumstances that bear upon the issue of racial animosity" (quoting *Snyder*, 552 U.S. at 478, 128 S. Ct. at 1208)). Defendant's overarching argument is that the trial court clearly erred when it concluded "the State's strikes were not substantially motivated by race . . . ." Defendant then includes numerous sub-arguments based on specific factors. We first review the overarching law on the third

step as well as the relevant factors, and then we evaluate each of Defendant's arguments.

¶ 45        "At the third step of the analysis, the defendant bears the burden of showing purposeful discrimination." *Hobbs*, 374 N.C. at 353, 841 S.E.2d at 499. As our Supreme Court recently explained:

> "The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Flowers*, 139 S. Ct. at 2243. At the third step, the trial court "must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." *Id.* at 2244. "The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.'" *Id.* (quoting *Foster v. Chatman*, [578] U.S. [488], 136 S. Ct. 1737, 1754, 195 L.Ed.2d 1 (2016)).

*Id.*; *see also Clegg*, ¶ 85 (including the substantial part language from *Flowers* and then explaining the United States Supreme Court has also articulated the burden as "whether it was more likely than not that the challenge was improperly motivated" (quoting *Johnson*, 545 U.S. at 170, 125 S. Ct. at 2417)).

¶ 46        To support the trial court's evaluation of all the relevant facts and circumstances, a defendant can "rely on 'a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race.'" *Hobbs*, 374 N.C. at 356, 841 S.E.2d at 501 (quoting *Flowers*, 139 S. Ct. at 2243). Relying on *Flowers*,

our Supreme Court in *Hobbs* listed the following factors:

> • statistical evidence about the prosecutor's use of peremptory strikes against [B]lack prospective jurors as compared to white prospective jurors in the case;
> • evidence of a prosecutor's disparate questioning and investigation of [B]lack and white prospective jurors in the case;
> • side-by-side comparisons of [B]lack prospective jurors who were struck and white prospective jurors who were not struck in the case;
> • a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
> • relevant history of the State's peremptory strikes in past cases; or
> • other relevant circumstances that bear upon the issue of racial discrimination.

*Id.* (citing *Flowers*, 139 S. Ct. at 2243). As the last factor indicates, that list from *Flowers* is not exclusive, and courts are permitted to consider any relevant circumstances. *Id.* Thus, in the past our courts have also considered "the susceptibility of the particular case to racial discrimination." *Porter*, 326 N.C. at 498, 391 S.E.2d at 150 (quotations and citations omitted).

¶ 47　　　Defendant argues numerous of those factors support his position that "[t]he trial court's conclusion that the State's strikes were not substantially motivated by race was clear error." We address each factor in turn.

### 1. *Trial Court's Ability to Conduct a Proper Comparative Juror Analysis*

¶ 48　　　Defendant first argues the trial court "could not conduct a proper comparative juror analysis as to the prosecutor's unsupported justifications." Specifically,

Defendant argues the trial court did not have the information it needed to compare R.S.'s criminal records, the connection of V.B.'s business to a drug investigation, and what the prosecutor knew about those characteristics in jurors. These arguments resemble the one Defendant made above at step two, but this factor should be analyzed at *Batson*'s third step instead. Further, Defendant asserts the "prosecutor's failure to conduct any investigation into those matters on the record either during voir dire or at the hearing is itself indicative of pretext." We briefly explain the law of comparative juror analysis before addressing each of those arguments in turn.

¶ 49        In *Miller-El II*, the United States Supreme Court recognized comparing struck venire members of color to white people allowed to serve was "more powerful" than "bare statistics" of strike rates alone. 545 U.S. at 241, 125 S. Ct. at 2325. "If a prosecutor's proffered reason for striking a [B]lack panelist applies just as well to an otherwise-similar non[B]lack [person] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.* The similar white jurors need not be identical. *Flowers*, 139 S. Ct. at 2249. In *Miller-El II*, for example, strong similarities between the struck Black venire members and the non-Black jurors were sufficient to conclude a comparative juror analysis supported a finding that race was significant in determining who was challenged. 545 U.S. at 247, 252, 125 S. Ct. at 2329, 2332.

¶ 50        We first address Defendant's argument that the trial court did not have the

information it needed to compare R.S.'s criminal record to other potential jurors. We reject Defendant's argument because we disagree with what he asserts the record must include. Defendant faults the trial court for not asking the prosecutor to provide criminal history reports or his "cheat sheet" on potential jurors' criminal histories, but the trial court was not required to do so. A key feature of the *Batson* inquiry is the trial court's evaluation of the prosecutor's credibility. *See Hernandez*, 500 U.S. at 365, 111 S. Ct. at 1869 (explaining deference to trial court because the *Batson* inquiry "largely will turn on evaluation of credibility" (quotations and citation omitted)). Here, the trial court was inherently evaluating the prosecutor's credibility when it accepted his representations as to running criminal history checks on all jurors and learning of R.S.'s criminal record. Therefore, the trial court had the proper record before it even without the actual documents the prosecutor used.

¶ 51        Defendant emphasizes, in making the lack of record argument, the trial court's comment at the remand hearing that it was accepting the prosecutor's statement regarding R.S.'s criminal history "as the gospel." While the trial court's language was hyperbole, the context surrounding that statement reveals the trial court did not foreclose the possibility the prosecutor was wrong. Rather, after Defendant's attorney brought up the lack of evidence in the record of R.S.'s criminal history, the trial court asked about whether Defendant had evidence that criminal history representation was wrong:

> [MR. ROZEAR (one of Defendant's attorney's)]: . . . . And I
> first note that we don't have anything in the record in front
> of us showing the existence of this conviction, so I'm not
> sure that –
> THE COURT: Are you saying that Mr. Thigpen is not
> correct when he said he had that criminal record?
> MR. ROZEAR: I -- I -- I don't know. I have no --
> THE COURT: The Court's accepting that as the gospel. I
> don't think he would have said that if that wasn't the case.
> I can't imagine -- now if it isn't the case, obviously, we've
> got a problem.
> MR. ROZEAR: Right.
> THE COURT: But I don't think I would make that
> accusation unless you've got some basis for it.
> MR. ROZEAR: Fair enough, Your Honor.

This exchange came after the trial court offered Defendant's counsel time for a recess to do their own research into the information on criminal history, but Defendant's counsel declined after conferring briefly. Defendant's counsel had the same access to criminal records of the jurors as the State, and if Defendant's counsel believed the State misrepresented this information, he was free to check to confirm it. Thus, the trial court was open to evidence the prosecutor was wrong about R.S.'s criminal history, but Defendant simply did not present any evidence after having declined the trial court's offer to give him time to independently research criminal histories of prospective jurors. The trial court was not required to do any more. *See State v. Smith*, 352 N.C. 531, 540–41, 532 S.E.2d 773, 780–81 (2000) (rejecting defendant's appeal on *Batson* issue when the prosecutor's reasoning was based on a potential juror's unrevealed criminal record and defendant, when given the chance, had not

sought criminal record information to support its argument that reasoning was pretextual). Defendant has not carried the burden to show purposeful discrimination at this step. *Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231.

¶ 52          Defendant makes a similar argument about the lack of ability to compare between jurors with respect to the prosecutor's reason for striking V.B., specifically the alleged connection between V.B.'s business and a drug investigation. We reject that argument again because all the reasons we laid out above apply equally here. First, the trial court accepted the prosecutor's statement as credible. Second, Defendant failed to present any evidence to the contrary. While we acknowledge Defendant could not undertake the same investigation as the prosecution in regard to a criminal investigation that did not even result in charges against V.B., this Court has accepted a similar explanation in the past. *See King*, 353 N.C. at 470–72, 546 S.E.2d at 587–88 (finding no *Batson* violation when the prosecutor said he struck a Black juror because he had information of an investigation into the juror's father that forced the father to resign from the police department). Even without that precedent, the connection to the drug investigation is but one reason the prosecutor gave for striking V.B., and the comparative juror analysis is but one factor given "[t]he trial court must consider the prosecutor's race-neutral explanations in light of *all* of the relevant facts and circumstances." *Hobbs*, 374 N.C. at 353, 841 S.E.2d at 499 (quoting *Flowers*, 139 S. Ct. at 2243) (emphasis added). And as a practical matter, a

requirement that the prosecutor present evidence regarding a drug investigation as part of the *Batson* hearing—even where the Defendant has not argued any reason to disbelieve the prosecution's representations about the investigation – could lead to a series of mini-trials regarding each challenged juror and risk identifying confidential informants. *See State v. Jackson*, 322 N.C. 251, 258, 368 S.E.2d 838, 842 (warning against creating a "trial within a trial" when conducting the *Batson* examination).

¶ 53        In his third argument, Defendant contends the trial court lacked information about what the prosecutor knew about other jurors' criminal records and potential connections to police investigations. As to the criminal records of other jurors, Defendant's argument does not comport with the record. The prosecutor told the trial court he had an assistant run the criminal records of everyone on the jury list for him. And as a practical matter, the prosecutor would need to know about the past criminal records of all potential jurors, as a white juror who failed to answer this question truthfully would be of the same concern to the prosecution as a Black juror.

¶ 54        As to the investigation, the prosecutor received that information from the deputy sitting with him at counsel's table. The State argues the prosecutor could not "query" the deputy for "a comprehensive check on all the prospective jurors," so any lack of information as to other jurors' connections to investigations "would not reflect a choice to ignore that characteristic." Given the comparative juror analysis is but one factor and the prosecutor offered a separate explanation for striking V.B. before

bringing up the investigation, we cannot say the trial court clearly erred based on this alone.

¶ 55 In his final argument under the heading about the trial court's inability to conduct a comparative juror analysis, Defendant argues "the prosecutor's failure to conduct any investigation into those matters on the record either during voir dire or at the hearing is itself evidence of pretext." Defendant later expands on this argument by highlighting *Flowers* found "the failure to inquire is itself evidence of pretext." (Citing *Flowers*, 139 S. Ct. at 2249.) Defendant then argues his counsel presented the prosecutor an opportunity during voir dire to clarify his reasoning but the prosecutor only argued Defendant's showing was insufficient to make a prima facie case.

¶ 56 Defendant correctly states the law. Disparate investigation and a failure to meaningfully voir dire a potential juror on a subject used later to justify a strike could be evidence an explanation is pretextual. *Flowers*, 139 S. Ct. at 2248–49. Still, "disparate questioning or investigation alone does not constitute a *Batson* violation." *Id.* at 2248; *see also Clegg*, ¶ 94 (relying on *Flowers* to explain disparate questioning and investigation can inform the trial court's *Batson* evaluation but does not alone constitute a *Batson* violation). We have already addressed the allegations of disparate investigation above when we discussed what evidence the prosecutor had about other jurors' criminal records and connections to criminal investigations.

¶ 57        As to the failure to ask the jurors about the topics during voir dire, the prosecutor offered explanations at the remand hearing. That differentiates this case from *Clegg* where our Supreme Court recently relied on disparate questioning to find a *Batson* violation by in part noting the prosecutor asked additional questions of a Black juror "without explanation." *Id.*, ¶¶ 93–95. Here, the prosecutor explained he did not want to embarrass V.B. or reveal the methods of an undercover investigation. As to R.S.'s criminal record, the prosecutor explained he did not want to embarrass R.S. and had seen other prosecutors striking jurors for undisclosed criminal records without questioning them. Among those explanations, the desire to avoid revealing police undercover investigations appears reasonable. The other explanations are race-neutral. We agree with Defendant, however, much of the embarrassment of the venire members could have been mitigated by conducting voir dire on the subjects outside of the presence of the other potential jurors. But again, conducting separate voir dire of potential jurors is a time-consuming process. If the prosecutor had decided to challenge for cause instead of using a preemptory challenge, perhaps he would have requested a separate voir dire to inquire into the undisclosed criminal record. Instead, he chose to use a preemptory challenge, avoiding the need for more time-consuming and potentially embarrassing questioning of the juror. A factfinder's choice between "two permissible views of the evidence . . . cannot be clearly erroneous." *King*, 353 N.C. at 470, 546 S.E.2d at 587. As a result, we cannot find

clear error here where the trial court accepted plausibly race-neutral explanations for Defendant's failure to question R.S. and V.B. about the subjects the prosecutor later used to justify the strikes.

¶ 58     We also reject Defendant's argument the prosecutor had to create a record justifying his strikes at the initial *Batson* hearing. Defendant points us to a part of the initial trial transcript where his attorney indicated there was nothing in the State's voir dire about prior criminal convictions or other bases for the two jurors being excused. Notably, this line was the first sentence after Defendant's attorney made a *Batson* motion. As such, it was appropriate for the prosecutor to respond by arguing Defendant had not made out a prima facie case. The inquiry was still at step one where Defendant had the burden to make out a prima facie case, which comes before the prosecutor would have a burden to offer any explanation let alone defend it against charges of pretext. *See Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231 (laying out the three *Batson* steps). Thus, this was not the appropriate stage for the prosecutor to present an explanation or evidence regarding reasons for striking the jurors. If we were to accept Defendant's argument, as a practical matter, the State would have to demonstrate cause for every strike of a Black juror instead of using peremptory strikes, but that is not the law.

¶ 59     Reviewing all of Defendant's arguments on the trial court's ability to conduct a proper comparative juror analysis, we cannot conclude the trial court clearly erred.

### 2. *Comparative Juror Analysis*

¶ 60    After arguing the trial court could not have conducted a proper comparative juror analysis, Defendant includes his own comparative juror analyses for the challenges based on both R.S.'s criminal record and V.B.'s confusion when answering a question. Defendant argues the analysis of other jurors' criminal records reveals "there is reason to be skeptical of the trial court's findings." Similarly, Defendant contends the prosecutor's confusion reasoning for V.B. "does not withstand scrutiny." We address each argument in turn.

¶ 61    First, Defendant asks us to take judicial notice of numerous traffic violations of venire members to support his argument the trial court was wrong to find R.S. was the only potential juror who had personal interaction with the criminal justice system, even traffic violations. Assuming *arguendo* the jurors' traffic violations as compiled by Defendant are accurate, we are not persuaded they demonstrate the trial court clearly erred in finding the State's strikes were not substantially motivated by race. The trial court's findings on jurors' personal interaction with the criminal justice system mention interactions "even related to traffic violations":

> Prospective Juror [R.S.] was the only juror that ADA Thigpen noted who had a felony or misdemeanor conviction, and indeed was the only prospective juror ADA Thigpen noted as having any personal interaction with the criminal justice system, even related to traffic violations.

But, the prosecutor's initial explanation focused on *felony* convictions:

> So as it relates to, first, Perspective Juror Number 10, [R.S.], Judge, based upon the information that I had, [R.S.] had an undisclosed criminal record that included a conviction for common law robbery and possession with intent to sell an unauthorized recording device . . . and a probation violation. I made a note of his record. When he was called into the box, and if it -- and *it was important to me because of the prior felony conviction.* He's the only juror of which I made that note and he's *the only juror that I noted had a prior felony conviction.*

(Emphasis added.) Thus, the trial court's Finding of Fact overstated what the prosecutor had said at the hearing. Given that *Batson*'s second step, which sets up the third step here, focuses on the prosecutor's explanation, *Hobbs*, 374 N.C. at 352–53, 841 S.E.2d at 499, we will take his actual explanation as controlling rather than the court's overstated summary.[9]

---

[9] Defendant argues the prosecutor drafted the order signed by the trial court and thus we should attribute that overstatement of the prosecutor's reasons to him and find it "reeks of afterthought." (Citing *Miller-El II*, 545 U.S. at 246, 125 S. Ct. at 2328.) While both parties were to present proposed orders to the trial court, we do not have before us the proposed orders for comparison to the final order. As such, we are not willing to assign responsibility for this overstatement to the prosecutor specifically or the State more generally. And regardless of which draft the trial court used—if either—the trial judge is ultimately responsible for the order. *See In re A.B.*, 239 N.C. App. 157, 167, 768 S.E.2d 573, 579 (2015) ("[T]he order is the responsibility of the trial court, no matter who physically prepares the draft of the order.").

We also note this explanation does not reek of afterthought because the prosecutor made clear he was not concerned about traffic violations during the original jury selection process. The prosecutor specifically excluded speeding tickets from his questions about jurors' past convictions. The trial court also noted in its Findings of Fact the prosecutor excluded traffic tickets when asking jurors about their past interactions with the criminal justice system: "Prospective Juror [R.S.] was the only juror who did not answer the questions truthfully

¶ 62      Taking the explanation given by the prosecutor at the remand hearing's step two portion, the comparative juror analysis compiled by Defendant does not persuade us. With the exception of a driving while impaired charge, all of the interactions listed by Defendant are minor traffic infractions of speeding, registration issues, and a seatbelt violation. As for the DWI, the State presents evidence that the prospective juror was acquitted on the charge, and we accept that evidence and argument *arguendo* as well since we did the same with Defendant's evidence. Thus, as the prosecutor represented, R.S. was the only juror with a prior felony conviction, so there are no substantially similar non-Black jurors with whom to conduct a comparison. *See Miller-El II*, 545 U.S. at 247, 125 S. Ct. at 2329 (setting out the substantially similar standard for conducting a comparative juror analysis). The trial court did not clearly err by finding there were no substantially similar non-Black jurors based upon the prior felony conviction.

¶ 63      Turning to the comparative juror analysis of V.B.'s answers to voir dire questions, Defendant begins by arguing our Supreme Court already conducted a comparative juror analysis and "held there was an 'absence of any significant

---

because he did not disclose his prior criminal record, despite being part of the full jury panel that was asked if any member had been a defendant in a case before (T. p. 34) and asked if any juror themselves, a member of their family, or a close friend had ever been charged or convicted of anything other than a speeding ticket (T. p. 45)." Therefore, rather than reeking of afterthought, the inclusion of traffic violations appears to be a misstatement by the trial court; the prosecutor from the beginning did not care about them.

dissimilarity between the answers given'" by another juror and V.B. (Citing *Bennett II*, 374 N.C. at 599, 843 S.E.2d at 235–36.) While the Supreme Court found an "absence of any significant dissimilarity between the answers given" by R.S., V.B., and the third juror, it only used that to conclude Defendant had made out a "prima facie case of purposeful discrimination." *Bennett II*, 374 N.C. at 599, 843 S.E.2d at 235–36. The prima facie first step of a *Batson* analysis, however, is fundamentally different from the third step the trial court had to address and we now confront. As our Supreme Court explained in a case that came out a month before *Bennett II*, the burden on the defendant at step one "is one of production, not of persuasion. That is, a defendant need only provide evidence supporting an inference discrimination has occurred." *Hobbs*, 374 N.C. at 351, 841 S.E.2d at 498. In *Bennett II*, the Supreme Court further explained "the existence of such a permissible inference" is not "the same thing as an ultimate conclusion that impermissible discrimination has, in fact, taken place." 374 N.C. at 598, 843 S.E.2d at 235 (citing *Johnson*, 545 U.S. at 171, 125 S. Ct. at 2417–18). "As a result, a court should not attempt to determine whether a prosecutor has actually engaged in impermissible purposeful discrimination at the first step of the *Batson* inquiry." *Id.*, 374 N.C. at 599, 843 S.E.2d at 235. Given these admonitions, we reject Defendant's argument that the Supreme Court's analysis of the similarity between V.B. and other jurors at step one should control our analysis here at step three.

¶ 64    Conducting our own comparative juror analysis, the prosecutor explained he struck V.B. because "she appeared to have some difficulty with what I call the 'watch-it-happen question,'" which is "a question about whether or not a juror could make a decision based only upon hearing testimony." The prosecutor explained he started asking that question after hearing about an 11 to 1 hung jury in a colleague's case in another county because the holdout juror in that case "said he could not make a decision unless he saw it happen." The prosecutor went on to explain:

> I noted that [V.B.] looked confused by the question. She said she could base her decision on "kind of both" or "kind of on both." I tried to clarify that by asking her what she meant and she replied, "Sometimes I guess it's better not to have hearsay."
> Well, Judge, that told me that she preferred maybe video evidence or something other than just live testimony. I knew that there would not be any video testimony. Officers in this case don't have or did not wear body cameras and did not have in-car. I tried to clarify that question again and her answer was, "Yeah." I asked the question again and her [sic] she responded, "Uh-huh." So, at that point, I'm beginning to get concerned that she's telling me what she thinks I want to hear, and I'm questioning does she understand what I'm asking. She is the only juror that gave those responses and had that apparent difficulty with that question."

The question before us is whether the prosecutor's proffered reason above "applies just as well to an otherwise-similar" non-Black juror. *Miller-El II*, 545 U.S. at 241, 125 S. Ct. at 2325.

¶ 65    Defendant first argues we should not accept this explanation because it was

based on demeanor and such explanations should be viewed with greater scrutiny. Reading the whole explanation given by the prosecutor, we do not agree that his reasoning for striking V.B. was based on demeanor. While the prosecutor noted V.B. looked confused, he then spent two paragraphs discussing how her answers exhibited what he believed was confusion and otherwise concerned him. While the case Defendant cites does not provide any explanation of what it means by demeanor-based strikes because its analysis does not turn on jurors struck for those reasons, *see Harris v. Hardy*, 680 F.3d 942, 965 (7th Cir. 2012) (explaining those strikes are troubling but consideration of them was unnecessary because the defendant carried his burden elsewhere), plain meaning alone demonstrates the prosecutor's reasoning was not demeanor-based. Further, in *Clegg*, our Supreme Court recently found a *Batson* violation based in part on its rejection of the prosecutor's demeanor-based reasoning. *Id.*, ¶¶ 77–78 (demeanor analysis), ¶ 100 (ultimately concluding there was a *Batson* violation). There, the prosecutor's reasoning was based on demeanor when he mentioned the potential juror's "body language and lack of eye contact." *Id.*, ¶ 77. Here, the prosecutor did not primarily focus on V.B.'s demeanor. Rather, the prosecutor's explanation was based on V.B.'s answers in the record; he noted the appearance of confusion only as an introduction to his reasoning, which was based upon actual responses, not V.B.'s demeanor.

¶ 66    Turning to a comparison based on V.B.'s answers, Defendant argues V.B. was

similar to a "non-Black" juror, R.C. Defendant argues R.C. exhibited similar behavior, which the prosecutor characterized as confusion with V.B.'s answers, when the prosecutor asked R.C. a question about whether she would not be able to consider the testimony of a witness testifying pursuant to a plea agreement. Rather than challenge Defendant's representation of R.C.'s answers, the State responds the difference in the questions to which each potential juror responded meant they were not substantially similar and thus could not be compared.

¶ 67        As our Supreme Court noted in *Bennett II*, the relevant colloquy between V.B. and the prosecutor, Mr. Thigpen, occurred as follows:

> MR. THIGPEN: Do you think you could reach a verdict based only on hearing the evidence from the witness stand, or do you feel like in order to reach a verdict or to make a decision you would have to actually watch the alleged event happen?
> [V.B.]: Yeah.
> MR. THIGPEN: Okay. You looked confused. Some people— I have had jurors before that have said, "I can't make a decision until I see it happen."
> [V.B.]: Uh-huh.
> MR. THIGPEN: Okay. Do you feel like you could base your decision on just what the witnesses say, or do you feel like you have to watch it happen?
> [V.B.]: Kind of on both.
> MR. THIGPEN: What do you mean?
> [V.B.]: Sometimes, I guess, it's better to not have hearsay.
> MR. THIGPEN: Well, if you watched it happen, you would be a witness; right?
> [V.B.]: Right.
> MR. THIGPEN: And if you were a witness, you can't be a juror. Does that make sense?

[V.B.]: Yes.

MR. THIGPEN: So the only thing we have is witness testimony.

[V.B.]: Okay.

MR. THIGPEN: So do you feel like you could make a decision based only on hearing the testimony of the witnesses or before you could make that decision would you actually want to watch it happen?

[V.B.]: Yeah.

MR. THIGPEN: Okay. What you said was, "Yeah."

[V.B.]: Yeah, I could make that decision through—

MR. THIGPEN: Based on the testimony?

[V.B.]: Uh-huh.

374 N.C. at 583–84, 843 S.E.2d at 226.

¶ 68      The relevant exchange between the prosecutor and R.C. occurred as follows:

MR. THIGPEN: Okay. Now, [R.C.], a witness may testify on behalf of the State as a result of a plea agreement with the State in exchange for [a] sentence concession. Based on that fact and that fact alone, would you not be able to consider that person's testimony along with all other evidence that you would hear in the case?

[R.C.]: Yes, sir. No, sir.

MR. THIGPEN: Do you understand my question?

[R.C.]: Say it again.

MR. THIGPEN: A witness may testify under a plea agreement in exchange for a sentence concession.

[R.C.]: Okay.

MR. THIGPEN: Now if that person were to testify, are you just going to go, [t]his person's made a deal; I don't care what they are going to say, or would you listen to it and consider it just like anybody else?

[R.C.]: I would listen to their testimony and consider it.

*Id.*, 374 N.C. at 585, 843 S.E.2d at 227 (all alterations other than removing juror name in original). Arguably, R.C.'s answer of "Yes, sir. No, sir." resembles V.B.'s

answer of "Kind of on both" in that each one equivocates and requires further explanation. But it is also true that the question to R.C. was confusing since it was phrased in the negative: "would you *not* be able to consider . . . ." *Id.* Thus, to give an affirmative answer would require a negative response, essentially, "No, sir, I would not *not* be able to consider . . . ." After answering, "Yes, sir," it appears R.C. realized the question was phrased with a "not" so she changed the answer to "No, sir."

¶ 69 Whether R.C's answer demonstrated confusion based on a question phrased in the negative or equivocation, we agree with the State the trial court did not clearly err in finding the confusing answers were not substantially similar because of the questions to which each responded. The prosecutor explained at the remand hearing that R.C.'s answer was "not as big an issue" to him because he "expect[ed] people to be skeptical of confidential informants, of cooperating codefendants" and was not planning on calling the witness who would be testifying pursuant to the plea agreement. By contrast, the prosecutor explained the question he asked to V.B. was critical because he was concerned "she regarded testimony as hearsay" and his whole case was "going to be witness testimony." The prosecutor went on to explain he knew about a prior case that had a jury hang 11 to 1 on not having video to watch it happen. This rationale built on the prosecutor's initial explanation that he struck V.B. because she said she preferred video evidence but he knew "there would not be any video testimony." As a result, the question on which V.B. gave confusing answers was far

more material to the prosecution's case than the question to which R.C. gave confusing answers.

¶ 70       The trial court gave a similar explanation for why it did not credit the comparison between R.C. and V.B.:

> Any similarity between prospective Jurors [V.B.] and [R.C.] on the basis of momentary confusion does not support an inference of discriminatory intent. Prospective Juror [V.B.] was confused on an issue that touched almost every piece of evidence in the State's case but Juror [R.C.]'s confusion was on an issue not even at play in the State's case.

Based on our review of the confusing answers of V.B. and R.C., we conclude the trial court did not clearly err in determining they were not substantially similar, as would be required to support a *Batson* violation.

### 3.  *Susceptibility of Case to Racial Discrimination*

¶ 71       After finishing with his two arguments related to the comparative juror analysis factor, Defendant contends the trial court clearly erred in determining "this case was not susceptible to racial discrimination . . . ."  To support that argument, Defendant provides law review articles and reports from nonprofit organizations, which according to Defendant show "[c]riminal cases are susceptible to racial bias at all stages" and that drug cases are particularly susceptible "given pervasive cultural stereotypes and disparities in law enforcement related to drugs."  Defendant then argues the trial court erred because it focused on the race of witnesses, the

anticipated evidence, and the lack of victims rather than "the effect of bias and racial stereotypes on *jurors*." (Emphasis in original.) Defendant further faults the trial court for saying evidence of disparate arrest and imprisonment rates for drug crimes would be applicable to every case with an African-American defendant.

¶ 72 At *Batson*'s third step, "the judge should consider the susceptibility of the particular case to racial discrimination." *Porter*, 326 N.C. at 498, 391 S.E.2d at 150. "The race of the defendant, the victims, and the key witnesses bears upon this determination." *Id.*, 326 N.C. at 498, 391 S.E.2d at 150–51. Specifically, our courts have focused on whether the case crosses racial lines among those key figures. *Contrast id.*, 326 N.C. at 500, 391 S.E.2d at 152 (finding no error in trial court's third step analysis based in part on the fact that the victim, both of the defendant's counsel, and the defendant were all Native American) *and State v. Fair*, 354 N.C. 131, 142, 557 S.E.2d 500, 511 (2001) (finding the jury selection process was "less likely to be susceptible to racial discrimination" when the defendant, victim, and half of the State's witnesses were African-American) *with Golphin*, 352 N.C. at 432, 533 S.E.2d at 214 (explaining "this case may be one susceptible to racial discrimination because defendants are African-Americans and the victims were Caucasian").

¶ 73 Defendant contends he presented significant evidence about "pervasive cultural stereotypes and disparities in law enforcement related to drugs" as part of his argument that this case was susceptible to racial discrimination because

Defendant is Black and faced prosecution for a drug offense. In particular, Defendant presented law review articles, academic journal articles, and a study by the ACLU regarding disparate arrest and sentencing rates for Black people for drug crimes. Even if we assume the conclusions of the authors of these articles and the study are correct, that type of evidence is not what our Supreme Court meant in *Porter* when it listed "the susceptibility of the particular case to racial discrimination" as a relevant third step factor. *Porter*, 326 N.C. at 498, 391 S.E.2d at 150. Rather, as seen in *Porter* and subsequent cases expanding on the factor, a case is particularly susceptible to racial discrimination if the identities of the defendant, victims, and witnesses cross racial lines. *See id.*, 326 N.C. at 500, 391 S.E.2d at 152; *Fair*, 354 N.C. at 142, 557 S.E.2d at 511; *Golphin*, 352 N.C. at 432, 533 S.E.2d at 214 (all focusing on racial identity of those key players and whether it is the same or different across those groups).

Here, the trial court found Defendant is African-American, there were no victims, and "[t]here is no record of the race of key witnesses." The trial court also found there was no evidence of "any potential racial motivations on the part of any witness." Based upon these Findings, the trial court determined the case was not susceptible to racial discrimination and emphasized that there were no cross racial issues. The trial court did not err in that analysis; it did exactly what our caselaw required it to do. Where there is no evidence of any racial motivations or

discrimination in the particular case under review, our precedent does not allow us to account in some sort of general philosophical way for "the effect of bias and racial stereotypes on *jurors*" as Defendant wants us to consider. If Defendant wants to argue the precedent should change or be expanded upon, that argument is more properly directed at our Supreme Court. *E.g.*, *Jones*, 253 N.C. App. at 796, 802 S.E.2d at 523 ("[T]his Court has no authority to reverse existing Supreme Court precedent." (quotations and citation omitted)).

The trial court also found:

> the defendant argued that the case was susceptible to racial discrimination because of (1) disparate arrest rates for marijuana possession and 'in general' and (2) disparate rates of imprisonment after conviction. These facts, if true, would not give a prosecutor motivation to keep members of a particular race off the jury. The facts the defendant cited, if true, are applicable to every case with an African-American defendant, thus making this case not 'particularly susceptible' to racial discrimination.

(Citations omitted.) Defendant argues that the trial court appeared to hold "that, because all Black people may face racial discrimination within the criminal justice system, no individual Black person can argue that such discrimination could affect their specific case." We do not read the trial court's finding so broadly. The trial court was correct that Defendant's argument, as stated, would in fact mean that every case with a Black defendant would be considered as "particularly susceptible" to racial discrimination for purposes of a *Batson* analysis, but that is not the law. Even if we

accept as true Defendant's evidence which indicates Black people have a disparate arrest rate and rate of imprisonment after conviction for marijuana possession and "in general," this does not mean that a particular case is "susceptible to racial discrimination" for purposes of the *Batson* analysis.[10]  While our precedent does not allow us to consider such disparate impact evidence for the susceptibility analysis, this type of evidence could be relevant to a trial court's consideration of a defendant's *Batson* argument, depending upon the particular features of the case under consideration, including the crime charged, the races of the defendant, victims, and witnesses, and other unique facts of a particular case.  *See Batson*, 476 U.S. at 97–98, 106 S. Ct. at 1723 ("The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race.").[11]  The trial court properly conducted the analysis required by our precedent and did not clearly err in finding this case was not susceptible to racial discrimination.

### 4. *History of Racial Discrimination in Jury Selection in Sampson County*

---

[10] Defendant's charges were related to methamphetamine, not marijuana.  *See Bennett II*, 374 N.C. at 581, 843 S.E.2d at 224–25 (summarizing charges); *id.*, 374 N.C. at 587–88, 843 S.E.2d at 228–29 (noting convictions on methamphetamine charges).

[11] Just before that quote, *Batson* also explains the Equal Protection Clause "forbids the States to strike [B]lack veniremen on the assumption that they will be biased in a particular case simply because the defendant is [B]lack."  476 U.S. at 97, 106 S. Ct. at 1723.

¶ 76    Defendant's fourth argument asserts the trial court clearly erred in disregarding "the history of discriminatory strikes by the State . . . ." Defendant first recounts how he presented a Michigan State University ("MSU") study to the trial court that found, across three capital cases between 1990 and 2010, prosecutors in Sampson County struck 73.9% of qualified Black venire members but struck only 19.4% of qualified non-Black venire members.[12] Defendant later notes he told the trial court the results of the MSU study have been replicated by a Wake Forest University study. Defendant then takes issue with each of the four reasons the trial court gave for discounting the study. According to Defendant, the trial court was wrong to discount the MSU study: (1) on the basis that recent law school graduates collected the data because the United States Supreme Court has cited data with that collection method; (2) on the basis prosecutors "were not consulted in conjunction with the study" because our Supreme Court has "repeatedly cited, discussed, and relied

---

[12] The authors of the MSU study are two associate professors at the Michigan State University College of Law. Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina Capital Trials*, 97 Iowa L. Rev. 1531, 1531 n.aa1 (2012). They "examined jury selection in at least one proceeding for each inmate who resided on North Carolina's death row as of July 1, 2010, for a total of 173 proceedings." *Id.* at 1542–43. According to Defendant, three of these capital cases were from Sampson County, but the article cited does not identify the counties where the proceedings occurred. The article does include a footnote regarding a "list of current death row inmates" available at the website of the North Carolina Department of Public Safety and that list identifies the county where each was convicted. *Id.* at 1533 n.6. Obviously the inmates listed on the website have changed since publication of the article in 2012, but we will assume for purposes of this opinion that Defendant's representation of three cases as of July 2010 from Sampson County is correct.

upon" the MSU study "when describing the history of discrimination in jury selection in various counties in our State"; (3) on the basis the MSU study was conducted on cold trial transcripts because "[e]very single *Batson* decision from the Supreme Court has been decided on a cold record"; and (4) on the basis the prosecutor in this case was not involved in the MSU study cases because *Batson*-line precedents do not require historical evidence to directly show the specific prosecutor has a history of discrimination.

¶ 77        As a preliminary matter, we agree with Defendant's summary of the trial court's reasoning for determining "the MSU study's conclusions are of limited, if any[,] usefulness . . . ." We also agree the trial court's first three reasons, as listed in the numbering above, do not support discounting the MSU study. For any study, the trial court should evaluate the purpose of the study and its methodology and reliability, but just the fact that law students provided assistance does not make it reliable or unreliable, without more information. Defendant notes that  Justice Breyer's concurrence in *Miller-El II* cites at least one study where law students provided research assistance. *See Miller-El II*, 545 U.S. at 268, 125 S. Ct. at 2341 (Breyer, J. Concurring) (citing Baldus, Woodworth, Zuckerman, Weiner, & Broffitt, *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U. Pa. J. Const. L. 3, 52–53, 73, n.197 (2001)); Baldus et al., *The Use of Peremptory Challenges*, *supra*, at 3 n.a1 (listing law students who provided research

assistance). While Justice Breyer used the evidence to show discriminatory use of peremptory challenges remains a problem in general rather than in a specific case as Defendant argues for here, *Miller-El II*, 545 U.S. at 268, 125 S. Ct. at 2341, his citation at least indicates support for analysis based on law student data collection. Also, in general law students appear capable of collecting data under the supervision of researchers.

¶ 78        Turning to the trial court's second criticism of the lack of prosecutorial opinions in the study, we again agree with Defendant that reason does not necessarily undermine the study. Again, the trial court must consider the methodology of each study and the purpose for which the information is presented. The results of a study may be more trustworthy if the methodology is sound and it draws information from more sources, but it is not necessarily of *no* value based on the lack of prosecutorial opinions. In addition, as Defendant notes, our Supreme Court has favorably cited the MSU study multiple times, albeit all in the context of Racial Justice Act claims rather than *Batson*. *Robinson III*, 375 N.C. at 179–80, 846 S.E.2d at 717; *State v. Augustine*, 375 N.C. 376, 378, 847 S.E.2d 729, 730 (2020); *State v. Burke*, 374 N.C. 617, 619, 843 S.E.2d 246, 248 (2020). At the very least, those cites suggest the study's methodology for collecting disparate jury strike percentages was acceptable. *See Robinson III*, 375 N.C. at 179–80, 846 S.E.2d at 717 (recounting disparate jury strike evidence). To the extent the trial judge's issue with the MSU study was based on his concerns that it

read racial animus from racial disparities without consulting prosecutors who could have countered such analytical paths, we address that below with our discussion of the trial court's final criticism.

¶ 79          We also agree with Defendant's argument that the trial court's third reason, the conducting of the study on a cold record, does not justify discounting it. As Defendant points out, all *Batson* precedents—and indeed our entire appellate court system in this state and in this country—rely on reviewing the cold record. While a review of the cold record may not be the same as a trial court's perspective, the standard of review takes this factor into account. For example, here, the clear error standard of review recognizes the trial court's superior ability to evaluate credibility in comparison to a cold record alone. *See King*, 353 N.C. at 469–70, 546 S.E.2d at 586–87 (explaining the clear error standard of review reflects that rulings on race neutrality turn on evaluations of credibility); *Cummings*, 346 N.C. at 309, 488 S.E.2d at 561 (explaining trial courts are in the best position to make those credibility evaluations). In addition, a court can consider the reliability and completeness of the information provided from the cold record in each study. For example, the MSU study notes the data sources and methods of collection of information regarding the jurors and voir dire for the cases included in the study. Grosso & O'Brien, *A Stubborn Legacy, supra*, at 1542–48. Since the MSU study included *only* capital murder trials, *id.* at 1533, the records may have been more complete and detailed than would be

expected for non-capital and lower-level felony trials.[13]   Thus, the fact that a study is based upon review of the "cold record" of the cases does not necessarily undermine its value.

¶ 80        Finally, the trial court discounted the MSU study because it did not show racial disparity in juror strikes in past cases involving the prosecutor in this case. Defendant contends the trial court was wrong to discount the MSU study on this basis because historical evidence does not require "direct evidence that a particular prosecutor was involved in past discrimination." To support this position, Defendant relies on  the United States Supreme Court's decision in *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 123 S. Ct. 1029 (2003), and our Supreme Court's decision in *Hobbs*.

¶ 81        Defendant's reliance on *Miller-El I* and on *Hobbs* is misplaced because the portions he cites come from the cases' evaluation of *Batson*'s first step.  *See Miller-El I*, 537 U.S. at 346–47, 123 S. Ct. at 1044–45 (stating, "Finally, *in our threshold examination*, we accord some weight to petitioner's historical evidence of racial discrimination by the District Attorney's Office" before discussing the evidence to which Defendant points (emphasis added)); *Hobbs*, 374 N.C. at 350–51, 841 S.E.2d at 497–98 (describing how the prima facie step works before then indicating "a court

---

[13] Even if jury selection information may be more complete for capital murder trials, the study does not address whether jury selection statistics from capital murder trials are necessarily comparable to lower level felony trials such as Defendant's trial on charges of possession and distribution of methamphetamine precursors and trafficking in methamphetamine.

must consider historical evidence of discrimination"). As we have explained more fully above, a defendant's burden at *Batson*'s first step is fundamentally different from his burden at *Batson*'s third step. "At the stage of presenting a prima facie case, the defendant is not required to persuade the court conclusively that discrimination has occurred." *Hobbs*, 374 N.C. at 351, 841 S.E.2d at 498. At the third step, defendants are required to persuade the court conclusively that discrimination has occurred. *See Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231 (summarizing *Batson*'s third step as "the trial court must then determine *whether the defendant has met the burden of proving purposeful discrimination*" (emphasis added)). Given this difference between the first and third steps in the *Batson* analysis, we cannot find that *Miller-El I* and *Hobbs* support Defendant's argument about the relevance of data that Sampson County prosecutors other than the one here struck Black venire members at a disproportionate rate.

¶ 82    However, in the time since the trial court made its ruling and the parties finished their supplemental briefing, our Supreme Court has clarified statistical evidence "regarding the disproportionate use of peremptory strikes against Black potential jurors" should be considered.[14] *Clegg*, ¶ 81. *Clegg* endorsed statistics of

---

[14] The trial court's error here is particularly understandable given Defendant did not identify a case where evidence of racial disparity alone supported a finding of purposeful discrimination at *Batson*'s third step. Further, the history of *Batson*, as a Fourteenth

disparate strike rates in noncapital cases.  *See Clegg*, ¶ 69 (describing the data), ¶ 81 (accepting the data.)  Notably, our Supreme Court in *Clegg* relied on preliminary results from the same Wake Forest study Defendant cites.  *See id.*, ¶ 68 (explaining the trial court noted evidence about non-capital cases from Pollitt & Warren, 94 N.C. L. Rev. at 1964); Daniel R. Pollitt & Brittany P. Warren, *Thirty Years of Disappointment: North Carolina's Remarkable Appellate Batson Record*, 94 N.C. L. Rev. 1957, 1964 n.44 (2016) (citing "preliminary findings from a study of jury selection in all non-capital North Carolina felony trials from 2011-2012" conducted by Wake Forest University School of Law professors showing a 16% strike rate of non-white potential jurors and an 8% strike rate of white potential jurors); Ronald F. Wright, Kami Chavis, & Gregory S. Parks, *The Jury Sunshine Project: Jury Selection Data as a Political Issue*, 2018 U. Ill. L. Rev. 1407, 1419–20 (Wake Forest professors' final study cited by Defendant including study of juror strikes in all North Carolina

---

Amendment Equal Protection Clause case line, *Batson*, 476 U.S. at 89, 106 S. Ct. at 1719 ("[T]he State's privilege to strike individual jurors through peremptory challenges[] is subject to the commands of the Equal Protection Clause."), has focused on racially discriminatory purpose rather than racially disproportionate impact alone.  *See Washington v. Davis*, 426 U.S. 229, 239–40, 96 S. Ct. 2040, 2047–48 (1976) (explaining in the equal protection context in general, "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose," such that a violation does not arise from a state action "*solely* because it has a racially disproportionate impact" (emphasis added)).  *Batson* itself explained while evidence of racial disparity may provide "[c]ircumstantial evidence of invidious intent," such disparity is not alone enough absent (near) total exclusive of African Americans from jury venires.  476 U.S. at 93, 106 S. Ct. at 1721.  Against this pre-*Clegg* backdrop, the trial court could understandably have discounted the racial disparity evidence in the MSU study.

felony trials in 2011).

¶ 83        Based on *Clegg*—which was decided after the trial court's consideration of this case—the trial court did not identify a proper basis for failing to take into account Defendant's data showing racially disparate strike rates in Sampson County, regardless of whether the same prosecutor in this case was involved in the studied cases.   Yet we note that a trial court could weigh the usefulness of statistical information based upon the timing of the study and any relevant changes in the policies or procedures of the prosecutor's office in a particular county, even if the data does not identify the particular prosecutor involved in a case.  For example, the MSU study began about 25 years and concluded about 5 years before the jury selection in this case.  *See* Grosso & O'Brien, *A Stubborn Legacy, supra*, at 1557 n.101 (noting first trial court to review the study summarized it as looking at jury selection practices in capital cases in this state between 1990 and 2010).  The record does not indicate if the practices or policies of the District Attorney's office in Sampson County were the same during the years covered by the study and 2017, when Defendant was tried.  Our Supreme Court has noted these policies could be quite important.  In *Clegg* the Supreme Court noted that in *Miller-El II*, there was evidence of "'a specific policy [in the prosecutor's office] of systematically excluding [B]lack[] [people] from juries' evidenced by a training manual that 'outlined the reasoning for excluding minorities from jury service.'"  *Clegg*, ¶ 31 (quoting *Miller-El II*, 545 U.S. at 263–64, 125 S. Ct.

at 2338–39) (alterations in original). The Wake Forest study was more recent than the MSU study but was still based upon information collected at least six years before Defendant's trial. *See* Wright, Chavis, & Parks, *The Jury Sunshine Project, supra*, at 1419 (explaining the project examined all felony trials for which the authors could find adequate information in the state in 2011). But even weighing the data in Defendant's favor, we cannot find the trial court clearly erred, as we would be required to find to reverse the trial court. *See Chapman*, 359 N.C. at 339, 611 S.E.2d at 806 (explaining standard of review in *Batson* cases is clear error). Side-by-side comparisons of the potential jurors are more powerful than "bare statistics," *Miller-El II*, 545 U.S. at 241, 125 S. Ct. at 2325, and those comparisons here support the prosecutor. Further, we have already concluded the lack of susceptibility of this case to racial discrimination favors the prosecutor's reasoning as well. Given those two factors, as well as the final factor we discuss below, the trial court did not clearly err in its ultimate determination that Defendant has failed to show purposeful discrimination as required at *Batson*'s third step.

### 5. *Weight Given to Black Jurors Accepted by the State*

¶ 84 Defendant finally argues the trial court "gave improper weight to the Black jurors accepted by the State." Specifically, Defendant alleges the trial court erred in finding the prosecutor's acceptance of three African-American jurors before the initial *Batson* hearing and two after the hearing tended to negate an inference of racial

discrimination. Defendant also noted *Bennett II* rejected the evidence of the prosecutor's acceptance of other Black jurors "when *all of* the peremptory strikes he did use were against Black jurors." (Emphasis in original; citing *Bennett II*, 374 N.C. at 600–01, 843 S.E.2d at 237.) Lastly, Defendant highlights the "racially-motivated strike of even a single juror is a *Batson* violation, regardless of how many jurors of the same race the prosecutor accepted."

¶ 85        First, as with Defendant's other arguments based on *Bennett II*, we note our Supreme Court was focused on the first step of the *Batson* inquiry, whether Defendant showed a prima facie case: "[W]e do not find the State's argument that defendant failed to show the existence of the required *prima facie case* of discrimination based upon the fact that the prosecutor accepted three of the five African American prospective jurors that were tendered to him for questioning to be persuasive." *Bennett II*, 374 N.C. at 600–01, 843 S.E.2d at 237 (emphasis added). As we have repeatedly explained above, the first step differs significantly from the third step. *See Hobbs*, 374 N.C. at 351, 841 S.E.2d at 498 (explaining the prima facie case does not require showing purposeful discrimination).

¶ 86        That being said, the reasoning of our Supreme Court in *Bennett II* relied on *Flowers* and *Miller-El II*, both of which are *Batson* step three cases. *See Bennett II*, 374 N.C. at 600–01, 843 S.E.2d at 236–37 (citing *Flowers*, which in turn cited *Miller-El II* for the idea that the United States Supreme Court was skeptical of the

prosecution's decision to accept one Black juror because it could be done to obscure an otherwise consistent pattern of opposition to seating Black jurors); *Flowers*, 139 S. Ct. at 2244 ("The question for this Court is whether the Mississippi trial court clearly erred in concluding that the State was not motivated in substantial part by discriminatory intent when exercising peremptory strikes at Flowers' sixth trial." (citation and quotations omitted)); *Miller-El II*, 545 U.S. at 241, 125 S. Ct. at 2325 (explaining at the start of its analysis that it was looking at "evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step"). And we also acknowledge *Batson*'s central premise that "[i]n the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *See Flowers*, 139 S. Ct. at 2241 (summarizing *Batson* as stressing that point).

¶ 87 Still, the trial court did not clearly err by giving weight to the Black jurors accepted by the prosecution because the situation here is different from the situations warned of in *Miller-El II* and *Flowers*. In *Miller-El II*, the Supreme Court emphasized the "late-stage" nature of the decision in contrast to behavior earlier in the jury empanelment process. 545 U.S. at 250, 125 S. Ct. at 2330. Here, by contrast, the prosecution accepted three Black jurors before striking R.S. and V.B. and accepted two more after.

¶ 88 Turning to *Flowers*, the Supreme Court there emphasized the prosecution could not hide behind the fact that it accepted one Black juror at Flowers's *sixth* trial

given "[t]he overall record of this case," especially the prosecution having struck all

Black jurors at four previous trials of Flowers. 139 S. Ct. at 2246. Here, as we have

explained throughout the rest of this opinion, the overall record does not present a

clear picture of intentional discrimination as in *Flowers*. We further note that while

only one Black juror was accepted in *Flowers*, 139 S. Ct. at 2246, the prosecution here

accepted five. Ultimately, the jury included 5 Black and 7 white jurors. Notably, this

final breakdown includes a higher percentage of Black jurors than the relative

population of Black people within Sampson County at the time[15], which reinforces

---

[15] The final jury was 41.67% Black. According to United States Census Bureau County Population Demographics Data from 1 July 2016—the closest available data before Defendant's March 2017 trial, *Bennett II*, 374 N.C. at 581, 843 S.E.2d at 225—non-Hispanic Black and multiracial people represented 27.15% of Sampson County's population. *See County Population by Characteristics: 2010-2019*, UNITED STATES CENSUS BUREAU (Oct. 8, 2021), https://www.census.gov/data/tables/time-series/demo/popest/2010s-counties-detail.html (including "Annual County Resident Population Estimates by Age, Sex, Race, and Hispanic Origin" data as well as a "File Layout" guide to understand the datasets).

We also make two quick notes on our methodology. First, we rely on United States Census Bureau data because the record did not include data on the population statistics of Sampson County. However, the record includes the Wake Forest Study discussed above, and that study used "census information about the population and racial breakdown of each county" in its analysis. Wright, Chavis, & Parks, *The Jury Sunshine Project, supra*, at 1422. Since Defendant relied on a study using similar underlying data, we rely on the same here to address his arguments.

Second, we explain how we calculated the percentages. After downloading all the North Carolina data from the Census Bureau, we isolated the data from Sampson County for Year "9" since that is the year that corresponds to data from 1 July 2016 according to the "File Layout" guide. We then calculated a total population of 63,225 by summing the "TOT_POP" columns across all age groups. To get the population of non-Hispanic Black and multiracial people, we summed the four columns for non-Hispanic Black males (NHBA_MALE), non-

the conclusion the prosecutor did not intentionally discriminate based on jurors' race. Given these differences from *Flowers* and from *Miller-El II*, the trial court did not clearly err in weighing the prosecution's acceptance of five other Black jurors.

### III.    Conclusion

Having reviewed the entire record, the trial court did not clearly err in overruling Defendant's *Batson* objections as to either R.S. or V.B.  We conclude the trial court properly conducted the *Batson* step two inquiry and find no clear error in its determination the prosecution proffered race neutral reasons.  We also find no clear error in the trial court's step three evaluation of whether the Defendant met his burden of proving purposeful discrimination based on the following relevant factors: comparative juror analyses; susceptibility of the case to racial discrimination; historical evidence of discriminatory strikes by the Sampson County prosecutor's office; and weight given to the prosecution's acceptance of other Black jurors before and after R.S. and V.B.  Therefore, we affirm.

AFFIRMED.

---

Hispanic Black females (NHBA_FEMALE), non-Hispanic multiracial males (NHTOM_MALE), and non-Hispanic multiracial females (NHTOM_FEMALE), which resulted in a total of 17,165 non-Hispanic Black or multiracial people in Sampson County at the time.  Finally, we divided the non-Hispanic Black or multiracial population by the total population to determine non-Hispanic Black or multiracial people represented 27.15% of the population of Sampson County as of 1 July 2016.

Judges WOOD and JACKSON concur.